### UNITED STATES v. ARENAS.
#### No. 11195.

Circuit Court of Appeals, Ninth Circuit.

Dec. 12, 1946.

Rehearing Denied Jan. 14, 1947.

David L. Bazelon, Asst. Atty. Gen., and Roger P. Marquis and Dwight Doty, Attys., Dept. of Justice, both of Washington, D. C., and Eugene D. Williams, Sp. Asst. to Atty. Gen., of Los Angeles, Cal., for appellant.

John W. Preston, Oliver O. Clark, David D. Sallee, and Robert A. Smith, all of Los Angeles, Cal., for appellee.

Before GARRECHT, MATHEWS, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

As the appellant itself suggests, the Supreme Court, in an opinion rendered at an earlier stage of the present litigation, has "pointed the way * * * for a decision on the full record which is now before this Court."

Accordingly, we will set out herein, in italics, the "signposts" of law and of fact contained in the opinion to which the appellant refers—Arenas v. United States, 322 U.S. 419, 64 S.Ct. 1090, 88 L.Ed. 1363. We will supplement the Supreme Court's outline with material developed or suggested by the "full record" presented when the same case was again heard in the court below.[1] D.C., 60 F.Supp. 411.

We shall find that, almost paragraph by paragraph, the Supreme Court's opinion charts the course that we must follow here.

*"The petitioner Arenas is a full-blood Mission Indian, regularly enrolled in the Agua Caliente or Palm Springs Band. He sued in the United States District Court to be awarded a trust patent to certain lands on the Palm Springs Reservation."* 322 U.S. at page 420, 64 S.Ct. at page 1090, 88 L.Ed. 1363.

In the instant case, the appellee is suing for allotment trust patents in his own name and as sole heir at law and next of kin of Guadaloupe Arenas, his wife, who died on March 26, 1937; his father, Francisco Arenas, who died on October 4, 1924; and his brother, Simon Arenas, who died on February 18, 1925. [R. 10, 14, 19, 24–26, 49]

---

[1] Because of the importance of this case and the earnestness and energy with which it has been litigated, we are supplying the page numbers of the record.

"For a long period Congress pursued the policy of imposing, as rapidly as possible, our system of individual land tenure on the Indian. To this end tribal or communal land holdings of the Indians were superseded by allotment to individuals, who were protected against improvidence by restraints on alienation. The Mission Indians had deserved well and had fared badly and Congress passed the Mission Indian Act of Jan. 12, 1891 for their particular redress." 322 U.S. at pages 420, 421, 64 S.Ct. at page 1090, 88 L.Ed. 1363.

In support of its statement that the Mission Indians "had deserved well and had fared badly," the Supreme Court cites Sen. Rep.No. 74, 50th Cong., 1st Sess. In that report, the Senate Committee began its recommendation of the passage of the Mission Indian Act in the following words:

"The history of the Mission Indians for a century may be written in four words: conversion, civilization, neglect, outrage. The conversion and civilization were the work of the mission fathers previous to our acquisition of California; the neglect and outrage have been mainly our own. Justice and humanity alike demand the immediate action of the Government to preserve for their occupation the fragments of land not already taken from them."

In this same Senate document is embodied the report of the Mission Indian Commission appointment by the Government to make an investigation into the condition of these Indians. In the latter report, dated July 13, 1884, we find the following account of the red man's burden in Southern California:

"From tract after tract of such lands they have been driven out, year by year, by the white settlers of the country, until they can retreat no farther; some of their villages being literally in the last tillable spot on the desert's edge or in the mountain fastnesses. Yet there are in southern California today many fertile valleys, which only thirty years ago were like garden spots with these same Indians' wheat fields, orchards, and vineyards. Now there is left in these valleys no trace of the Indians' occupation, except the ruins of their adobe houses; in some instances these houses, still standing, are occupied by the robber whites who drove them out.

\* \* \* \* \* \*

" \* \* \* It is certain that in the case of these Mission Indians the rights involved are quite different from and superior to the mere 'occupancy' rights of the wild and uncivilized Indian."

The record in the instant case further buttresses the Supreme Court's statement. In a letter from the Commissioner of Indian Affairs to the Secretary of the Interior, dated December 13, 1944, and introduced by the appellant itself, the following language appears:

"The Indians prospered under the guidance and tutelage of the missionaries, but the Franciscan Fathers' failed to secure for the Indians vested rights in the lands they were using and occupying. As the lands became more valuable they were coveted by non-Indians. In 1822 Mexico, under whose rule California fell, made private grants of the more valuable of the Indian lands and through what is known as the Secularization Act provided a method for disposing of additional Indian lands as well as of the vast herds of cattle, sheep and horses owned by the Indians. Eventually the Indians were reduced to pauperism and beggary. Nevertheless when the Indians came under the sovereignty of the United States in 1848 under the Treaty of Guadalupe Hidalgo, 9 Stat. 922, they still retained some rights with respect to the land they occupied outside of the private grants. But the Indians did not remain undisturbed in this occupancy after the discovery of gold in California. They were driven from their land, robbed of their property and many of them murdered. In these circumstances the Indians settled where they could. They became occupants by sufferance on private lands, State lands and railroad grant lands. Some of them resided on land set aside by various Executive orders dating from 1875.

"To remedy the plight of the Indians by securing to them their remaining land rights and by providing permanent homes, Congress passed the Mission Indian Act of January 12, 1891, (26 Stat. 712) \* \* \*." [R. 304-305]

From the foregoing excerpts, it will be seen that, at least up to the second quarter of the nineteenth century, the Mission Indians literally "dwelt safely, every man under his vine and under his fig tree." 1 Kings 4:25. But after 1822, and particularly after California was admitted into the Union in 1850, it could be well said of the grape and fig and date lands of the Mission Indians: "The vine is dried up, and the fig tree languisheth; the palm tree * * * even all the trees of the field, are withered: because joy is withered away from the sons of men." Joel 1:12.

The Supreme Court opinion continues its narrative of the legislative and administrative history pertinent to the instant case, taking up first the Mission Indian Act:

"The first three sections of this Act set up a commission to settle these several bands on suitable reservations and directed that appropriate patents issue. The United States was to hold the titles in trust, however, for twenty-five years and then was to convey to the tribes any portions not previously patented in severalty to members. Several reservations were set apart, including one at Palm Springs, with which this and the St. Marie case [2] were concerned.

"The Act also provided in § 4 that whenever in the opinion of the Secretary of the Interior any of the Indians should 'be so advanced in civilization as to be capable of owning and managing land in severalty, the Secretary of the Interior may cause allotments to be made to such Indians, out of the land of such reservation' and it specified the acreage to be allotted to each. Section 5 provided that on approval of the allotments the Secretary should cause patents to issue in the name of the allottees. For twenty-five years the lands were to remain in trust for their benefit and then were to be conveyed in fee free of the trust."

In a footnote, the court quotes Sections 4 and 5 of the Act, as follows:

"'Sec. 4. That whenever any of the Indians residing upon any reservation patented under the provisions of this act shall, in the opinion of the Secretary of the Interior, be so advanced in civilization as to be capable of owning and managing land in severalty, the Secretary of the. Interior may cause allotments to be made to such Indians, out of the land of such reservation, in quantity as follows: To each head of a family not more than six hundred and forty acres nor less than one hundred and sixty acres of pasture or grazing land, and in addition thereto not exceeding twenty acres, as he shall deem for the best interest of the allottee, of arable land in some suitable locality; to each single person over twenty-one years of age not less than eighty nor more than six hundred and forty acres of pasture or grazing land and not exceeding ten acres of such arable land.

"'Sec. 5. That upon the approval of the allotments provided for in the preceding section by the Secretary of the Interior he shall cause patents to issue therefor in the name of the allottees, which shall be of the legal effect and declare that the United States does and will hold the land thus allotted for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State of California, and that at the expiration of said period the United States will convey the same by patent to the said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void: Provided, That these patents, when issued, shall override the patent authorized to be issued to the band or village as aforesaid, and shall separate the individual allotment from the lands held in common, which proviso shall be incorporated

---

[2] St. Marie v. United States, D.C., 24 F.Supp. 237, Id., 9 Cir., 108 F.2d 876, certiorari denied because petition out of time, 311 U.S. 652, 61 S.Ct. 35, 85 L. Ed. 417.

*in each of the village patents.'"* 322 U.S. at pages 421, 422, 64 S.Ct. at page 1091, 88 L.Ed. 1363.

The opinion then resumes its discussion of the legislation enacted on behalf of the Mission Indians, and of the administrative acts done in compliance therewith:

*"Nevertheless, little was done toward allotment in severalty to Mission Indians for nearly twenty-five years. One reason, we gather, was that the Act authorized allotment on a more liberal basis than available lands would permit, although there may have been other reasons. In 1916, however, Secretary Lane called the neglect to the attention of Congress and asked that he be authorized to make allotments in quantities governed by the General Allotment Act of 1887 as amended by section 17 of the Act of June 25, 1910, 36 Stat. 859, instead of in those set out in the Mission Indian Act of 1891. Thereupon Congress passed the Act of March 2, 1917 [39 Stat. 969, 976], by which it 'authorized and directed' the Secretary to proceed under the Act of 1910.*

*"The Secretary on June 7, 1921 appointed Harry E. Wadsworth as Special Allotting Agent at Large for the Mission Indian Reservations of California and instructed him to prepare schedules of selections for allotments thereon."* 322 U.S. at pages 422, 423, 64 S.Ct. at page 1091, 88 L.Ed. 1363.

At this point, it might be well to advert to the appellant's insistence that the "only relevancy of the General Allotment Act [supra, which will be discussed more fully hereafter], as binding upon the Secretary, is that he must allot to all Mission Indians and in the quantities specified therein." But the appellant concludes its argument on this phase of the case with the following statement: "Thus, Congress, rather than requiring the Secretary to follow the detailed procedure set out in the General Allotment Act, permitted him to exercise his discretion as to the procedure to be followed in making selections on and allotting the Mission Indian Reservation."

If this is correct, then it is highly relevant to point out that Wadsworth was specifically instructed by the Commissioner of Indian Affairs, with the approval of the Assistant Secretary of the Interior, to make all the Mission Indian allotments "under the provisions of the Act of Congress of February 8, 1887 (24 Stat.L. 388), as amended by the Act of June 25, 1910 (36 Stat.L. 855,) and supplemented by the Act of March 2, 1917 (39 Stat.L. 969-976)." [R. 46, 393, 402, 432]. And Wadsworth followed his instructions, noting the fact on the schedule as submitted to Washington. [Original Exhibit 15]

If, therefore, Congress "permitted" the Secretary of the Interior to "exercise his discretion as to the procedure to be followed in making selections" and allotments, it is clear that the Secretary exercised his discretion by choosing the General Allotment Act, "as amended and supplemented," as his legislative guide. This fact, as tending to establish the Departmental policy, will be important in considering the schedule of 1927.

The Supreme Court's recital continues:

*"In 1923, Wadsworth filed a schedule showing selections on the Palm Springs Reservation for fifty members of the Band. The Secretary expressly disapproved this schedule. Complaint had come from the Indians, many of whom did not want allotments and had not made the selections listed in their names. When they failed to choose, the allotment agent had made a choice for them."* 322 U.S. at page 423, 64 S.Ct. at page 1091, 88 L.Ed. 1363.

The "full record" now before us indicates that as early as 1923, confusion and delay prevailed in the Department of Interior as far as the Agua Caliente Indian Reservation was concerned.

Two inter-office memoranda set out the chronology of the 1923 allotment schedule and reveal the departmental ineptitude in dealing with it:

"Memorandum for Mr. [E. K.] Burlew, Administrative Assistant

"Reference is made to your memorandum of May 29th requesting certain information relating to the Palm Springs allotments.

"Upon examining our records we find that the allotment schedule was completed in the field and approved by the allotting

agent and the Superintendent on June 21, 1923; that it was received in the Indian Office on July 11, 1923; and that it was submitted to the Department with the approval of the Commissioner on August 6, 1923. At a conference in the Secretary's Office on or about November 1, 1923, the conclusion was reached to withhold final approval of the schedule.

"(sgd) E. B. Meritt,
 "Assistant Commissioner.
"May 31, 1924"

"Via Mr. Hauke

"The report of Mr. [Samuel] Blair [special inspector of the Department of the Interior] [R. 421] was carefully considered and much thought given it in the preparation of this letter.

"I have always believed that the best interests of the Indians lie in approving the allotments, but in view of present conditions it might be well to withhold such action until sometime in November.

"If we had approved the schedules promptly as they came in and issued patents, by this time all opposition would have vanished; but unfortunately we did not and we might as well wait until the latter part of the year as suggested by the Inspector.

"Marschalk

"Action to be withheld until about Dec. 1st, 1924, by request of Secretary.
 "TDM—9-1-1924" [R. 520-521]

And there the record ends, so far as the 1923 schedule is concerned. But the record of the Department's delays, indecision and growing bias against allotments generally, unfortunately does not end at this point. It continues with alarming crescendo until December, 1944, when, as we will fully set out, not only does the Secretary's "sound discretion" as to Palm Springs allotments dwindle into nothingness, but his personal knowledge of even the existence of such allotments simply does not appear.

We continue with the Supreme Court's narrative:

"*The Secretary instructed Wadsworth to prepare a new schedule listing only selections voluntarily made and to leave off those who did not desire allotments. In 1927, the Department received from Wadsworth a new schedule showing voluntary selections for twenty-four members of the Palm Springs Band.*

"*Each Indian for whom a selection was listed received from Wadsworth a certificate of selection for allotment. Each was stamped 'Not valid unless approved by the Secretary of the Interior.'*

"*On October 26, 1923, Wadsworth asked the Indian Department for instructions, reciting, 'Allotments being completed and certificates issued. Many allottees anxious to immediately occupy their selections and prepare things for early crops instead waiting for receipt of patents.' On the same day he received reply, 'No objection to Indians preparing their respective allotment selections for crops if properly listed on schedule.' Wadsworth also wrote to one, at least, of the allottees in the St. Marie case, saying among other things, 'It is difficult to tell exactly when you may expect these patents from Washington but I believe they should be here within 6 'weeks or so. They will come to the superintendent in Riverside, who will notify you that they are there and ready for delivery to you. In the meantime, the Commissioner of Indian Affairs in Washington authorizes me to say to you that from this date you are entitled to enter upon and take possession of these allotments, and these certificates will be your evidence of such authority until the trust patents are received by you.'*" 322 U.S. at pages 423, 424, 64 S.Ct. at page 1092, 88 L.Ed. 1363.

Wadsworth made similar promises to other Indians. In a statement before the Committee of Indian Affairs of the United States Senate, Marcus Pete, a full-blood Indian who owned about 56 houses in the Agua Caliente Reservation, of a total value of $48,350, said that he had selected the land for his allotment and for his children's allotments "through Mr. Wadsworth, United States special allotting agent." Pete further stated:

"And he told me that I would be given that ground because I had selected that ground and made improvements upon it." [3]

---

[3] Report of Hearing on S. 1424 and S. 2589, 75th Cong., 1st Sess., pages 260-261 (July 29, 1937).

In the court below, Wadsworth himself testified that he informed the allottees after the selections in each schedule had been made that "they could occupy the lands and make use of them as long as the allotments were scheduled out" [R. 146]; and that the Commissioner of Indian Affairs had authorized him to that effect [R. 142, 162, 164]. He also testified that it had been his experience that his allotments had come back within even less than six weeks—"less than a month." [R. 186-187]

These were not the rash statements of an irresponsible beginner, but the author-ized promises of a veteran of the Indian Service, who at that time had been in the work for twenty or more years. [R.138] Mr. Wadsworth had been praised at a meeting of Indians at Palm Springs by Assistant Commissioner Meritt, [R.150-151 and 521] and of him Inspector Blair had said in his comprehensive report on the conditions in the reservation:

"The Allotting Agent, Mr. Wadsworth, has honestly, conscientiously and faithfully endeavored to make the allotments on an equitable basis. He has done his best— no one could have done any better." [R. 435] The trial judge, at the conclusion of the venerable octogenarian's testimony, observed: "You retired 15 years too soon." [R. 190]

Wadsworth's standing and accomplishments in the Indian Service are significant not only in establishing that the allottees did believe and had the right to believe his authorized representations, but also as tending to refute the specious and belated criticism of his 1927 schedule, voiced by Commissioner Collier. That criticism will be discussed fully hereafter.

Continuing its narrative regarding the 1927 allotments, the Supreme Court's opinion sets forth:

"*Wadsworth filed the schedule with the Department of the Interior. He attached a certificate, among other things reciting 'that the allotments shown herein were made in accordance with the provisions of the act of Congress of February 8, 1887 as amended by the Act of June 25, 1910 and supplemented by the Act of March 2, 1917.' The General Land Office recom-*mended that the schedule be approved, with exceptions that appear to have no bearing on the case before us.*

"*But the allotments appear never to have been approved by the Secretary. He refuses to issue patents to which these Indians claim to be entitled.*" [R.424]

On December 14, 1944, seven months after the Supreme Court had handed down the opinion quoted from herein, and more than seventeen years after Wadsworth's schedule of selections for allotment [R. 314] had been received in the Indian Office [R. 317], Oscar L. Chapman, Assistant Secretary of the Interior, in a one-paragraph memorandum, disapproved the 1927 schedule. His disapproval was based upon the reasons noted in a lengthy letter by John Collier, Commissioner of Indian Affairs, which reasons Chapman adopted as his own. [R. 340]

Summarized, the Commissioner's reasons for disapproving the 1927 schedule were as follows: (1) It gave allotments to only a minority of the members of the Band; (2) it did not represent a proper exercise of the allotment policy; (3) it did not divide the land into selections of equal value; (4) some portions of the land covered by it were of too great value as a unit to be allotted in severalty; (5) if the 1927 schedule had been approved, a just and equitable division of the tribal assets would be impossible. [R.327-338]

In an attempt to explain the unconscionable delay on the part of the Department of the Interior in passing upon the allotment rights of these Indians, the appellant's brief asserts:

"A contention that there was abuse of discretion cannot be based upon the lapse of time between the submission of the schedule and its formal disapproval. There was no neglect or dilatoriness on the part of the Secretary but very careful consideration of a complex situation. This record shows him for years endeavoring to solve what is admittedly 'no ordinary allotment problem'," etc.

This attempt to justify the Secretary's delay is inconsistent with the Commissioner's own statement of what happened to the schedule after it reached Washing-

ton. After reciting "in minute detail" [R. 325] certain office and administrative matters related to the routing of the ill-starred document, the Commissioner stated his conclusion:

"For these reasons, I am satisfied that the 1927 schedule never was approved and in fact never was considered by you or any of your predecessors in office." [R.327]

How can it be said, then, that the Secretary of the Interior was burning the midnight oil, year after year, over this Palm Springs allotment problem, when he did not even "consider" the chief datum in that problem—the schedule of selections for allotment prepared by his own experienced and competent agent in the field?

Finally, the appellant argues:

"When, by reason of conditions existing on the Palm Springs Reservation he [the Secretary of the Interior] believed no allotments should be made thereon, he recommended extension of the tribal trust period * * * and endeavored to get a legislative declaration of what was then thought to be a matter within his discretion. When the Supreme Court construed the 1917 Act as removing from him discretion as to whether allotments should be made at all on the Palm Springs Reservation, he promptly disapproved the schedule."

From the foregoing, it is reasonably clear that the 1927 schedule was held up in the Indian Office for two reasons: First, in the hope that legislation, to be referred to in greater detail hereafter, would be enacted by Congress to abolish the system of allotments so far as the Mission Indians were concerned; and second, in the belief that, in any event, the Secretary had discretion as to whether allotments on these reservations should be made at all. When Congress and the Supreme Court both frustrated these hopes of the Commissioner's he "promptly"— that is, seven months after the Supreme Court's decision—recommended disapproval of the 1927 schedule.

In other words, the specious objections to the schedule appear to be mere "window dressing," under the cover of which Commissioner Collier could gratify his deep-seated and long-standing aversion to allotments generally.

This implacable opposition to allotments is irrefutably established by statements made at Congressional hearings, as well as by the "full record" in the instant case. In a statement before the Senate Committee on Indian Affairs at a hearing on S. 1424 and S.2589, Commissioner Collier said:

"The Department maintains that * * * it is contrary to the public policy to allot." [4]

Again, at the same hearing, the Commissioner said:

"We think that allotment, in most of these Mission lands, would be very unjust," etc.[5]

In the court below, Wadsworth testified that Commissioner Collier was "opposed to allotments." [R.149]

Collier's opposition seemed to have commenced early—in the 1920's, when he was secretary of the Indian Defense League or Association, as it is variously called in the record.

Referring to the organizations "largely responsible for the numerous protests, now on file with the Department, against the proposed allotments to the Mission Indians" [R.421], Inspector Blair, in his report to the Secretary of the Interior under date of April 30, 1924 [R.421], introduced in evidence by the appellant itself, wrote:

"The Indian Defense League

　　*　　*　　*　　*　　*　　*

"Mr. Collier is the paid secretary of this organization and I have been informed that he receives a salary of $5000.00 per year.

"Personally I am inclined to believe that if there was no salary attached to Mr. Collier's position he would soon lose his interest in Indian affairs." [R.423]

Mr. Wadsworth identified Commissioner Collier as having written letters opposing allotments while Collier was connected with the "American Indian Defense Association." [R. 148–149]

---

4 Id., at Page 175.　　　　5 Id., at Page 176.

Finally, the fourth reason assigned by Collier for the disapproval of the 1927 schedule discloses that his real objection was not to the particular schedule itself, but to allotments generally, at least as far as part of the land covered by the schedule was concerned:

"4. Some portions of the land covered by the 1927 schedule are of too great a value as a unit to be allotted in severalty." [R.335]

As to those portions, at least, Commissioner Collier admitted that no plan of allotment would have pleased him. Yet it must be borne in mind that, in a letter written by Commissioner Charles H. Burke, dated August 29, 1928, and addressed to the Secretary of the Interior—which letter Collier contends never reached the Secretary—[R.326] it is stated that the allotments were made and the schedule prepared "in accordance with instructions of this Department." [R.583] Nowhere in those instructions does it appear that Wadsworth was told not to include the lands to which Collier objected, [R.525-531] namely, those embraced in the much-discussed Section 14. [R.336-338]

Therefore, so far as Section 14 is concerned, at least it is evident from Collier's own recommendations that he objected not to the *method* of allotment, but to the *fact* of allotment.

As we read the record—and, indeed, even the briefs of the appellant itself—it is reasonably clear that Collier was planning to "pocket veto" his own agent's allotments by permitting them to gather dust in the pigeon-holes of the Department. When, in 1944, however, the Supreme Court cut from under him and his chief the power to disapprove of allotments *generally*, Collier bestirred himself and sought to adduce plausible reasons why that *particular* allotment of 1927 should not be approved. At this juncture, it should be observed that Collier's own letter contains internal evidence that it was an afterthought, made expedient by the Supreme Court's decision:

"It is true much time has elapsed since the 1927 schedule was transmitted by the Special Allotting Agent. Always the administrative assumption has been that until the schedules were approved, the land remained tribal and this view was confirmed by the St. Marie cases. In the light of the Supreme Court's opinion, however, it occurs to me that in order to settle all doubt as to your position and that of the Department it may be proper *now to consider* the 1927 schedule and to approve or disapprove the schedule." (Emphasis supplied) [R. 327]

In other words, Collier seems to be trying to do indirectly what the Supreme Court said that the Department could not do directly; namely, frustrate the Congressional policy of allotments to Mission Indians generally.

Quite apart, however, from Commissioner Collier's motives in opposing this schedule, the stubborn and unexplained fact remains that these Indian allottees were kept in suspense for nearly two decades as to whether or not their selections were to be approved and patents granted to them. Certainly, such unprecedented a delay constitutes neglect on the part of the Department. The legal consequences of such neglect will be considered hereafter.

At this point, it will suffice to observe that the Indians were entitled to have, with reasonable promptness, a yes-or-no answer as to whether they were going to get their patents. The Great White Father should place his dealings with his underprivileged wards upon a higher plane than that which has marked the conduct of the Department in the instant case. United States v. Shoshone Tribe of Indians, 304 U.S. 111, 116, 58 S.Ct. 794, 82 L.Ed. 1213; United States v. Alcea Band of Tillamooks, 67 S.Ct. 167.

Since the appellant concedes that the Supreme Court "construed the 1917 Act [supra] as removing from him [the Secretary of the Interior] discretion as to whether allotments should be made at all on the Palm Springs Reservation," we will quote from that section of the opinion only the portions helpful in resolving the issues that are still in controversy herein:

"*When he [Wadsworth] selected for those who did not choose for themselves, his schedule was disapproved, and only for that reason. He was returned to the task of compiling voluntary selections for those who desired allotments, it being thought that*

*if that were done those who objected 'would soon fall in line and request that they too be given their proportionate share of the allottable areas.' There is no denial that Wadsworth was authorized to hold out to the Indians that their patents would be received in a few weeks and that meanwhile, if not already living on their selected lands, they might enter into possession.*

*"To assume that the Act of 1917, while directing the Secretary to make allotments, only meant to give him uncontrolled discretion not to do so would be a doubtful construction, in view of its history. But even if it were so interpreted, it did not require the Secretary to manifest his exercise of discretion in any formal way. His opinion that the Indians had the capacity for individual responsibility for land ownership could be indicated by conduct as well as by words. We think his conduct and words amount both to an administrative construction of the 1917 Act as a direction and to the exercise of any discretion he may have had under it.*

*"If the Indians were not ready for allotments, why send an agent to hold out to them that hope and promise? Why the elaborate procedure of allotment? * * * History and common knowledge of these Indians would indicate that they are not wanting in whatever it is that makes up 'civilization'. Long ago the Franciscans converted them to Christianity, taught them to subsist by good husbandry and handicrafts.' Under the Treaty of Guadalupe Hidalgo Feb. 2, 1848, 9 Stat. 922, their ancestral lands and their governance passed from Mexico to the United States. During the gold discovery days they were too gentle to combat the ruthless pressures of the whites and came to lead a precarious and pitiable, but peaceful, existence. Eventually the country was aroused by their plight. * * * By the standards of peacefulness, industry, and gentleness these Indians have long been 'civilized.' Even tested by the standard of acquisitiveness, they seem not to have failed. Improvements made by Arenas on the lands he occupied in reliance upon his certificate are valued at $15,000." 322 U.S. at pages 426-428, 64 S.Ct. at page 1093, 88 L.Ed. 1363.*

Regarding the Secretary's discretion as to procedure for making the allotments, the Supreme Court observed:

*"We do not see that this is much in question nor is much in point, if true. Arenas does not question that the Secretary had discretion to adopt the method of allotment which was followed. He claims that both he and the Department have complied with it, that his choice has been ascertained, the lands have been identified and marked and reported to the Department, and that nothing remains for either to do to perfect the right to a patent. If there has been any irregularity in the procedure to lead to a patent, the Government has not pleaded or evidenced it in the case. We assume the Secretary's complete control of the method and, as the record stands, that his method has been executed to the point where a patent would issue but for the refusal of the Secretary."* 322 U.S. at pages 428, 429, 64 S.Ct. at page 1094, 88 L.Ed. 1363.

At this juncture, it should be pointed out that Commissioner Burke's letter of August 29, 1928, already referred to, not only set forth that the Palm Springs 1927 allotments had been "made * * * in accordance with instructions of this Department," but specified that Wadsworth's schedule was prepared "under the provisions of the Act of February 8, 1887 [24 Stats. 388] as amended by the Act of June 25, 1910 [36 Stats. 855] and supplemented by the Act of March 2, 1917 [39 Stat. 969–976]." [R. 583] The General Allotment Act gives the Indians the right of selection. It will be remembered that the appellant insists that the "only relevancy of the General Allotment Act, as binding upon the Secretary, is that he must allot to all Mission Indians and in the quantities specified therein," and that Congress permitted him to exercise his discretion as to the procedure to be followed. From Commissioner Burke's letter, it is clear that if the Secretary had any discretion as to what law should be Wadsworth's guide, in 1927 as in 1923 he exercised that discretion by designating the General Allotment Act as the governing statute. Commissioner Burke's letter is also a Departmental admission that in making the 1927 allotment Wadsworth did in fact follow both the General Allotment Act and

the Department's instructions given thereunder.

Proceeding to its third and last point, the Supreme Court's opinion in the Arenas case "points the way" to the determination of what it terms "the crux of the lawsuit"— "the Secretary's Discretion as to Final Approval of the Allotments."

"*It is as to this final step that Congress has invested the courts with some responsibility.*

"*The Act of August 15, 1894, 25 U.S.C. § 345, 25 U.S.C.A. § 345, authorizes Indians to commence and prosecute actions 'in relation to their right' to land under any allotment act or under any grant made by Congress 'in the proper district court of the United States; and said district courts are given jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty.' It is further provided that 'the judgment or decree of any such court in favor of any claimant to an allotment of land shall have the same effect, when properly certified to the Secretary of the Interior, as if such allotment had been allowed and approved by him.'*

"*Under this statute the courts have decided disputes between Indians and the Government as to the relative qualifications of two claimants to receive, as a member of a band, a patent, Hy-Yu-Tse-Mil-Kin v. Smith, 194 U.S. 401, 24 S.Ct. 676, 48 L.Ed. 1039, and whether particular lands were appropriate for allotment, United States v. Payne, 264 U.S. 446, 44 S.Ct. 352, 68 L.Ed. 782.*" Pages 429, 430, of 322 U.S., page 1094 of 64 S.Ct., 88 L.Ed. 1363.

The Payne case, cited in the preceding quoted paragraph "points the way" to the norm of conduct that the Government should adopt in dealing with Indians:

"They are an unlettered people, unskilled in the use of language (Jones v. Meehan, 175 U.S. 1, 10, 11, 20 S.Ct. 1, 44 L.Ed. 49), with regard to whom the United States occupies the position and assumes the responsibilities of virtual guardianship, bound by every moral and equitable consideration to discharge its trust with good faith and fairness (Choctaw Nation v. United States, 119 U.S. 1, 28, 7 S.Ct. 75, 30 L.Ed. 306). Construing the treaty liberally in favor of the rights claimed under it, as we are bound to do (Hauenstein v. Lynham, 100 U.S. 483, 487, 25 L.Ed. 628), * * *." Pages 448, 449 of 264 U.S., page 353 of 44 S.Ct., 68 L.Ed. 782.

After observing that the record then before it did not contain any information as to "what the dispute between the Secretary of the Interior and Arenas is about", the Supreme Court continues:

"*Certain facts do appear from which we know that this is no ordinary allotment problem. Each selection here included three kinds of land: a two-acre town lot, of considerable value; five acres of irrigable land of fair value; and forty acres of desert land. All of the town lots chosen are in Section 14, Township 4, South, Range 4, East. This section contains Palm Springs, a hot mineral spring, from which the reservation derives its name.*

"*But the reservation itself is a checkerboard affair. At the time of its establishment the odd numbered sections already had been granted to the Southern Pacific Railroad and hence the reservation consisted of only even numbered sections. On the railroad sections the whites have established the settlement known as Palm Springs, a flourishing winter resort with large hotels and the usual business places and residences that characterize such a development. Out of this situation has grown conflict of interest between the Indians and the whites and between Indians themselves. The Indians, to the annoyance of the whites, seek to exploit their ownership of the springs, and the whites are accused, not without probable cause, of coveting the Indians' property rights therein.*" Pages 430, 431 of 322 U.S., page 1095 of 64 S.Ct., 88 L.Ed. 1363.

Evidence adduced at various Congressional hearings dealing with the situation on the Palm Springs Reservation indicates that the leading business interests of the town urged the sale of the Indian lands in the immediate vicinity of Palm Springs. The arguments offered by those prominent

white residents of the fashionable resort had no connection, for the most part, with the welfare of the Indians but unmistakably savored of the counting-house.

As no doubt faithfully representing the views of the "best people" of Palm Springs, a statement prepared for submission to Commissioner Collier by the Palm Springs Chamber of Commerce is illuminating. It is found in the report of the hearing on S. 1424 and S. 2589, from which we have already quoted. It frankly sets forth what the Supreme Court termed "the annoyance of the whites" over the Indians' exploitation of the springs, the reasons for that annoyance, and the means whereby it might be eliminated. The entire document is quite lengthy, but we quote a few significant passages from its "Restatement," or recapitulation:

"The growth of Palm Springs is restricted and its orderly development prevented by the Indian reservation lands adjacent to its central areas.

\* \* \* \* \* \*

"The exemption from taxation of the Indian lands and improvements and their white occupants casts an unjust burden upon the owners and occupants of private lands.

\* \* \* \* \* \*

"A sale of the Indian lands in the immediate vicinity of Palm Springs is desirable."[6]

Elsewhere in the same statement, we find an even plainer revelation of the reasons why the "best people" of Palm Springs wanted to get rid of their Indian neighbors:

"So long as the Indians were scattered on their lands and were engaged in agricultural pursuits they created no problem. The difficulties have arisen since the Indians abandoned agriculture, moved to lands adjoining the heart of Palm Springs, and encouraged occupancy of their lands by hundreds of white residents who are largely laborers and a poor class of tourist.

"(2) *Menace to property values*—At the present time the cheap shack construction and lack of planned improvement which is notable in the settled part of the Palm Springs Indian Reservation lands is extremely detrimental to adjacent privately owned property."[7]

These objections of the influential white residents of Palm Springs seem to have impressed some of the officials of the Indian Service, including Commissioner Collier, who was opposed to allotments anyway.

C. L. Ellis, district superintendent of the Indian Field Service, with headquarters at Muskogee, Okla., under date of August 2, 1928, wrote to Collier as follows:

"These five selections each contain, as has been set out in previous reports, 40 acres of desert land which is exceedingly valuable for townsite purposes, being adjacent to the rapidly growing winter resort of Palm Springs which is becoming the most popular winter resort in California and attracting many people of great wealth who are building expensive winter homes there. Besides residences, there are several large hotels, two of which have invested a $1,000,000 or more each.

"I trust your office will acquiesce in my views that these five allotments should be eliminated from this schedule as suggested above." [R. 571, 572]

In his letter to the Secretary of the Interior of December 13, 1944, Commissioner Collier said:

"The city of Palm Springs is an expensive health and pleasure resort. It derives its support by catering to the wealthy. Those who sought the advantages of Palm Springs but could not afford to avail themselves of the luxurious accommodations and those who were employed in Palm Springs turned to Section 14 which afforded a comparatively inexpensive means of living. As a result individual Indians seized the opportunity to obtain income from the lands without labor by leasing to non-Indians small tracts of varying sizes and shapes on which through the years have been erected a variety of rather shabby structures used as stores, dwellings, trailer camps and other purposes. Very few of the Indian families of the tribe live on Section 14 but in normal years as many as 3,000 non-Indians reside there.

---

6 Id., Page 53. 7 Id., Page 35.

"In short, Section 14 has been developed, however poorly, as a low-class urban district. As such quite obviously it is not susceptible to division as were the vast stretches of rolling agricultural and timber land held by so many of the Indian tribes which were allotted under the General Allotment Act. Apart from the commercial value which attaches to some of the 2-acre lots in Section 14, which should not be allotted for reasons later discussed, the selections covered by the 1927 schedule would not serve as adequate allotments." [R. 332-333]

It will be observed that Commissioner Collier's expression, "rather shabby structures," is a close echo to "the cheap shack construction" decried by the Palm Springs Chamber of Commerce!

In refreshing contrast with the foregoing arguments of the market-place is the statement of Mrs. Alice Lee Jemison, Washington representative of the American Indian Federation. Her declaration was praised by two members of the House Committee as "one of the most intelligent and persuasive statements I have ever heard before the committee." [8]

Referring to H. R. 7450, which would have authorized the sale of part of the lands belonging to the Palm Springs Band, Mrs. Jemison said:

"The Federation has opposed this legislation and all legislation similar to it on the grounds that to pass legislation of this kind would be a violation of the vested property rights of the Indians of Palm Springs who have lived on this allotted land and developed it.

* * * * * * * * * *

"In other words, it is the question of expansion. It is the same question that arose when the white man first came to this country. Red Jacket, one of the most outstanding orators of my own tribe, the Senecas of New York State, expressed the matter very well when he said, 'The white people came here and asked us for a small space to spread their blankets. We gave them that space. Then they asked for a larger space to spread their blankets, and we gave them that space, and they continually asked us for a larger and a larger and a still larger space until there is no longer any room for us.'

* * * * * * * * * *

"I believe that an examination of the records which have been made here will show very clearly that the people of Palm Springs are likewise looking after their own interests in wishing to take this property from the Indians. There at Palm Springs you have a little band of Indians who were driven back into lands which were thought at that time to be worthless and useless.

"The story of the Indians of California is one which brings the blush of shame to any who read it." [9]

More impassioned but equally sincere was the outburst of Mrs. Juana S. Hatchitt, a Palm Springs Indian who spoke at another hearing of the House Committee of Indian Affairs:

"We cannot get rich but we pay our honest debts, and I am protecting the Indians because I know every Indian that is on that reservation, and know what they can do and what each cannot do. It is just because the people who come in there fool them, but these people never come to us because they know we will oppose their crooked deals. * * *

"They come there and oppress the Indians, and I pray to God Almighty for help for the Indians; the Almighty God knows that honest Indians live there and He protects them. * * * *" [10]

The Supreme Court's analysis of the Secretary's discretion as to the final approval of the allotments is helpful to us in the instant case, even though that analysis was based only upon the complaint and affidavit and upon the record of the St. Marie litigation, supra:

*"The jurisdictional Act of 1894, under which this suit is in the courts, requires*

[8] Report of Hearings before the Committee on Indian Affairs, House of Representatives, on H.R. 7450, 75th Cong., 3d Sess., Page 180.
[9] Id., Pages 168–169.

[10] Report of Hearings before the Committee of Indian Affairs, House of Representatives, on H.R.5297, 75th Cong., 1st Sess., Page 39.

them to adjudicate legal rights of the parties and to render a judgment which will stand in lieu of the Secretary's action if he has unlawfully denied a patent to an allotment to which the Indian is entitled. But courts are not to determine questions of Indian land policy, nor can the Secretary on grounds of policy deprive an allottee of any rights he may have acquired in his allotment. To separate questions of right from questions of policy requires judicial examination of any well pleaded allegation of the complaint and of any grounds advanced for refusal of the patent. Even in some discretionary matters, it has been held that if an official acts solely on grounds which misapprehend the legal rights of the parties, an otherwise unreviewable discretion may become subject to correction. Perkins v. Elg, 307 U.S. 325, 349, 59 S.Ct. 884, 896, 83 L.Ed. 1320.

"Since the government has not pleaded to the complaint nor offered evidence as to the Secretary's position we know it only as stated in argument. It appears that the sole reason for denying a patent is a departmental change of policy, by which the Secretary now disagrees with the allotment policy prescribed for these Indians by the Acts of 1891 and 1917. The Government brief says, 'Meanwhile opposition to the making of allotments in severalty developed among the members of the Palm Springs band of Indians, and as a result administrative action on the 1927 schedule was further delayed. During this period the conclusion was reached in the Department that in fairness to the band as a whole and from the standpoint of their best interests the lands scheduled for allotment should be held in a tribal status and dealt with as a tribal asset.' It says further, 'The Secretary has determined that it would be inequitable and detrimental to the Palm Springs band of Indians as a whole to approve any allotments on their reservation.' Again, 'the Secretary should not be compelled to carry through a plan of allotment in severalty which in his judgment will operate contrary to the best interests of the Palm Springs band of Indians, but he should be permitted to stay his hand and

seek a time which would be more in the interest of that band." Pages 432, 433 of 322 U.S., page 1095 of 64 S.Ct., 88 L.Ed. 1363.

The "full record" in this case clearly establishes that "a departmental change of policy" was the real reason behind the disapproval of the 1927 allotment.

For years the Department had favored allotments of the Mission Indian lands. On December 22, 1926, Commissioner Burke, in recommending to the Secretary that this same 1927 schedule be prepared, and after mentioning the various Mission reservations in which allotments had already been made, wrote:

"It is my opinion that if we should proceed to allot the Indians on the other Mission reservations who desire allotments, and for which each allottee would receive a trust patent, it would be for their best interests, and improved conditions would follow naturally." [R. 526]

The record is replete with similar official expressions. [R. 487, 493-494, 495, 497, 500, 502, 504, 505-506, 508-509, 511, 513]

Chiefly because of the influence of Commissioner Collier, however, as we have already endeavored to show, the Department steadily veered away from a policy of allotment, at least so far as the Palm Springs Indians were concerned.

The Supreme Court's opinion summarizes the legislation that the Secretary of the Interior recommended to Congress in furtherance of his opposition to allotments. It was in connection with some of this proposed legislation that the hearings from which we have quoted were held. The Court says:

"The Secretary has endeavored to persuade Congress that treatment other than the allotment policy embodied in its legislation would be more advantageous for the Indians. In 1935, he recommended to Congress a bill authorizing him to make a 99-year lease of the reservation lands.[11] This failed of enactment. In 1937, the Secretary recommended a bill to repeal the provisions of the Act of March 2, 1917, directing the making of allotments on the Mission Indian

---

"11. See H.R.Rep.No. 1521 and Sen.Rep. No. 1201, 74th Cong., 1st Sess.

*Reservations.*[12] *That bill failed. He also recommended a bill to authorize the sale of a part of the Palm Springs Reservation.*[13] *That likewise failed of enactment.*

"* * * *Congress not only has failed to deny these allotment rights by legislation, but has rejected urgent and reiterated appeals from the Department to do so.*" Page 433 of 322 U.S., page 1096 of 64 S. Ct., 88 L.Ed. 1363.

How strongly some of the Committee members in the House of Representatives felt about the efforts being made to deprive the Indians of their land is indicated by the passages at arms that they had with witnesses that advocated legislation designed for that purpose.

The arch-proponent of the sale of the Palm Springs Reservation lands, as the record clearly indicates, was Commissioner Collier. The following colloquy that occurred between the Commissioner and Representative Thomas O'Malley, of Wisconsin, is revealing:

"Mr. O'Malley. There is one more point in the bill. Why isn't it possible to protect the rights of the minority, the rights that they have established by reason presumably of their development of the land over many years, even though the allotment may be faulty? Why isn't it possible to have in this bill some protection for this minority, who may not want to sell? Why must they be subjected to a majority opinion?

"Commissioner Collier. Well, of course, it could be put in. You could supplement what is in the bill by providing that where anything is claimed by an Indian, even if he has not got title to it, that [sic] it shall be left out. You can do anything you want to but the effect would be to reduce the value of the real estate which would remain to be sold and to block the business-like use of the tracks [sic] not sold.

"Mr. O'Malley. In other words, in order to make real estate valuable you will have to forfeit all tribal land. You will have to sell all of the land including the land which the family may have worked on for years and the land which is vacant land with no water or anything on it. In other words, in order to get a good price you will have under this bill to absolutely disregard the minority located on certain pieces of land and you will be subjecting them to the will of the majority. You must necessarily throw this improved land in with the desert land in order to get the base price of the land, and that will be done despite the wishes of the minority. Is there no way by which the minority could be protected and not have to sell? If they have been on the land for 25 or 30 years and if they have worked on it for the same length of time, say for 30 years, they certainly should have some consideration in regard to it. For my part if I had been on a piece of land for 30 years and the people of my State decided that they would sell my land I would most strenuously object and I would have recourse to the laws of my State and the laws of the United States." [14]

While Carl Eardley, former United States Attorney who had handled some allotment suits involving the title to Palm Springs land, was making a statement, a question by Representative Fred L. Crawford, of Michigan, indicated that he too was not in sympathy with the aims of the Palm Springs Chamber of Commerce, so far as the Indians were concerned:

"Mr. Crawford. Do you think that these people, the members of the Palm Springs Chamber of Commerce, are entitled to raise a national issue simply because it happens to be that some poor people are on this land which [sic] they want to get rid of?"

"Mr. Eardley. I do not believe that the Palm Springs Chamber of Commerce is attempting to raise any national issue of it." [15]

Finally, in the penult paragraph of its opinion, the Supreme Court advances to the legal conclusion that, we think, definitively

---

"[12] Sen.Rep.No. 1238, 75th Cong., 1st Sess. The Palm Springs Indians were among those who had voted against application to them of the Indian Reorganization Act of 1934, 48 Stat. 984, which would have terminated all future allotment in severalty.

"[13] Hearings, House Committee on Indian Affairs, on H.R. 7450, 75th Cong., 3d Sess., pp. 5, 6."

[14] Id., Pages 13–14.

[15] Id., Pages 518–519.

"points the way" to the judgment that must be rendered in this case:

"*We think the grounds advanced by the Government by way of argument, although not by way of evidence, are inadequate to establish as matter of law that the petitioner has no legal right to a patent. Congress not only has failed to deny these allotment rights by legislation, but has rejected urgent and reiterated appeals from the Department to do so. Arenas is entitled to invoke the applicable legislation as it stands in determining whether he is entitled to have completed the all but fully executed policy of allotment.*" Pages 433, 434 of 322 U.S., page 1096 of 64 S.Ct., 88 L.Ed. 1363.

From the context, it is clear that the "policy of allotment" means the *Congressional* policy, and not the *Departmental* anti-allotment preferences; for on the preceding page we have just been told that "The Secretary has endeavored to persuade Congress that treatment other than the allotment policy embodied in its legislation would be more advantageous for the Indians."

As if to make the semaphore even more luminous, the Supreme Court adds this final footnote:

"*The Solicitor of the Department of Interior has himself indicated that where the Indian has done all he could to get his patent and has failed because of the neglect of public officers the courts will generally protect him, and that this may be proper even where there has been a failure to approve the allotment. See 55 Decisions of the Department of the Interior 295, 303, 304.*" Page 434 of 322 U.S., page 1096 of 64 S.Ct., 88 L.Ed. 1363.

The Department's decision referred to by the Supreme Court is Allotment Selections on the Fort Belknap Indian Reservation, handed down July 17, 1935. The Solicitor's opinion was approved by Assistant Secretary Chapman—the same official who approved Commissioner Collier's adverse memorandum in the instant case. The opinion reads in part as follows:

"* * * Another case interpreted the words in the original section 6 of the 1887 [General Allotment] Act '* * * every member * * * to whom allotments have been made shall have the benefit of * * * the laws * * * of the State * * *' as including every Indian who was entitled to approval and patenting of his selection even though such approval and patenting had not yet occurred. State v. Norris, 1893, 37 Neb. 299, 55 N.W. 1086.

"It may be concluded from these cases that, as a general rule of interpretation, the courts consider an 'allotment' as an assignment of the right of occupancy to an individual Indian; and that under allotment laws providing for patents an 'allotment' is made when the allottee becomes entitled to a patent as evidence of the allotment and promise of a fee title; and that, as will be shown more fully later, an allottee may become entitled to a patent even before the approval of his allotment selection wherever the applicable allotment law makes such approval mandatory after the showing of certain prescribed conditions, and such conditions have been shown.

"(3) Where an allotment has not been approved, on the other hand, approval and the issuance of a patent cannot be compelled by mandamus. [Cases cited] But it is recognized that an allottee acquires rights in land, with some of the incidents of ownership, when the allotting agents have set apart allotments and he has made his selection. Until that time an Indian eligible for allotment has only a floating right which is personal to himself and dies with him. [Cases cited] The owner of an allotment selection, even before its approval, has an inheritable interest (United States v. Chase (245 U.S. 89, 38 S.Ct. 24, 62 L.Ed. 168); Smith v. Bonifer [Bonifer v. Smith] 9 Cir., 1909 (166 F. 846); which will be protected from the outside world (Smith v. Bonifer, supra); and which he can transfer within limits (Henkel v. United States, supra, 237 U.S. 43, 35 S.Ct. 536, 59 L.Ed. 831; Id., 9 Cir., 196 F. 345; United States v. Chase, supra); * * * In these cases the courts lay down the principle that where an Indian has done all that is necessary and that he can do to become en-

titled to land, and fails to attain the right through the neglect or misconduct of public officers, the courts will protect him in such right. Again, where the claimant does all required of him, he acquires the right against the Government for the perfection of his title, and the right is to be determined as of the date it should have been perfected. Payne v. State of New Mexico, 255 U.S. 367, 41 S.Ct. 333, 65 L.Ed. 680; Raymond Bear Hill, supra [52 L.D. 689 (1929)].

"Further, where the right to the allotment has failed to become vested through the neglect of public officers to attach approval to the selection, one court has indicated that the right to allotment would be considered as already vested beyond the reach of a later act of Congress. Lemieux v. United States, 8 Cir., 1926, 15 F.2d 518, 521. In the Lemieux case the Secretary's approval under the Act of 1887 would have had to include determination of the qualifications of the applicants, but in the Fort Belknap situation [as in the case at bar], no question of qualifications arises, since previous enrollment on the allotment list is made by statute conclusive evidence of the enrollee's right to allotment. Thus the position of the Fort Belknap allottee compels even more strongly to the conclusion suggested in the Lemieux case. It has also been suggested that where the Indian possesses all the qualifications entitling him to an allotment, the Secretary has no longer any discretion to refuse approval. See State v. Norris, supra, 55 N.W. at page 1089." [Pages 298-299 and 303-304].

The Norris case, upon which the Solicitor relied so heavily in his Belknap opinion, supra, contains the following language:

"* * * The part to be taken by the Indian in this proceeding is much like that taken by a man 'taking up a homestead.' He selects the land he wishes, and the local authorities of the government confirm or reject his selection. Now, these Winnebago Indians selected each his allotment of land in severalty, under the terms of the act of congress, and took possession of said lands. The special agent of the government made the allotments, issued the certificates therefor, reported his action to the secretary of the interior, and recommended that patents should issue for the lands so allotted. These Indians had done all required of them by law to entitle them to the lands, and to the right of citizenship. It is undoubted that if they possessed the qualifications required by the act, as to birth, etc., and complied on their part with the other requirements of the law, the secretary of the interior has no discretion in the matter, but must approve the allotments made, and the patents must issue therefor. *The presumption is that the special agent made no allotments to any one not entitled thereto, and we will presume that all Indians holding the certificates of allotment under the act are entitled to their patents * * *.* Page 1089 of 55 N.W. [Emphasis supplied]

In the instant case, it is *undisputed* that "the special agent made no allotments to any one not entitled thereto," as far as the right of Lee and Guadaloupe Arenas to be listed in the 1927 schedule is concerned.

In Bonifer v. Smith, 4 Cir., 166 F. 846, 849, cited by the Solicitor in the Belknap case, supra, as "Smith v. Bonifer", its title in the trial court, Judge Gilbert, of this court, said:

"* * * If the selection so made by Philomme were prior in right to those of the appellants, and should have been allowed as made, equity will look upon that as done which ought to have been done, and will dispose of the rights of the parties as if the allotments had been allowed when the selections were made.

"In Lytle et al. v. State of Arkansas et al., 9 How. 314, 13 L.Ed. 153, the court said:

"'It is a well-established principle that where an individual, in the prosecution of a right, does everything which the law requires him to do, and he fails to attain his right by the misconduct or neglect of a public officer, the law will protect it.' "

In his dealings with the Indians, the Secretary of the Interior does not have the power of an Asiatic potentate or even of a benevolent despot. He, like his wards

themselves, is subject to legislative restrictions. The Supreme Court found it necessary to sound such a note of caution in the case of Ballinger v. United States ex rel. Frost, 216 U.S. 240, 249, 30 S.Ct. 338, 340, 54 L.Ed. 464:

"Whenever, in pursuance of the legislation of Congress, rights have become vested, it becomes the duty of the courts to see that those rights are not disturbed by any action of an executive officer, even the Secretary of the Interior, the head of a department. However laudable may be the motives of the Secretary, he, as all others, is bound by the provisions of Congressional legislation. It must be borne in mind that this allotment provided by Congress contemplated a distribution among the Choctaw and Chickasaw Indians of the lands that belonged to them in common. They were the principal beneficiaries, and their titles to the lands they selected should be protected against the efforts of outsiders to secure them. *White men settling on townsites were not the principal beneficiaries.*" [Emphasis supplied.]

See also Payne v. Central Pac. R. Co., 225 U.S. 228, 236, 237, 41 S.Ct. 314, 65 L.Ed. 598; Payne v. State of New Mexico, 255 U.S. 367, 371–372, 41 S.Ct. 333, 65 L.Ed. 680; State of Wyoming v. United States, 255 U.S. 489, 496, 497, 41 S.Ct. 393, 65 L.Ed. 742; United States v. Whitmire, 8 Cir., 236 F. 474, 480; Fort Peck Indian Reservation, 57 I.D. 16, 18–21, 24.

We next address our attention to the fourth ground upon which the Commissioner based his objection to the 1927 schedule:

"Some portions of the land covered by the 1927 schedule are of too great a value as a unit to be allotted in severalty." [R. 335]

We might well here paraphrase the language of the Supreme Court when it was considering the Secretary's discretion as to whether or not the Indians were ready for allotments, and ask:

If some portions of the land were of too great a value to be allotted in severalty, why send an agent to hold out to the Indians that hope and promise? Why the elaborate procedure of allotment?

It is significant that the appellant, in summarizing the Commissioner's reasons for recommending disapproval of the schedule, omits this fourth ground. Perhaps counsel for the Government realized that this fourth reason could not be defended under the applicable statutes and jurisprudence.

■ Be that as it may, it is clear that the Secretary no longer can refuse to allot Indian lands merely because they are too valuable. It is doubtful whether he ever had that power; but that question, under the Supreme Court's holding in the Arenas case, supra, is now moot:

"The Act of 1917, however, drops the language of discretion and *directs* the Secretary to cause allotments to be made to the Indians on the Mission reservations." Page 425 of 322 U.S., page 1093 of 64 S.Ct., 88 L.Ed. 1363; emphasis supplied by the Supreme Court.

In Leecy v. United States, 8 Cir., 190 F. 289, 292, appeal dismissed, 232 U.S. 731, 732, 34 S.Ct. 603, 58 L.Ed. 818, the court said:

"Congress authorized the allotment of these lands, and if the Secretary of the Interior could under his authority withdraw a portion of them from allotment he could withdraw substantially all of them, if that seemed in his judgment best, and under the contention of the government he would be executing an allotment law under rules and regulations prescribed, when in fact he nullified the law by withdrawing the very lands from allotment which Congress had authorized to be so distributed."

This Court cited the Leecy case, supra, with approval in United States v. Payne, 9 Cir., 284 F. 827, 829, affirmed, 264 U.S. 446, 44 S.Ct. 352, 68 L.Ed. 782, supra.

■ Finally, a concise and, we think, a fairly accurate summary of the ambit of the Secretary's powers with respect to Indian allotments has been given by Solicitor Margold, of the Department of the Interior, in Fort Peck Indian Reservation, supra, 57 I.D. 16, 18-19, in an opinion handed down on May 31, 1939:

"Where allotment selections have been duly made under authority of the Depart-

ment and pursuant to its official instructions and in accordance with a course of allotment on the reservation, in my opinion it is probable that a court would hold that the Secretary cannot decline to approve particular selections because of a subsequent change in land policy. His authority to disapprove such selections would be limited to disapproving particular selections not entitled to approval because of error or the ineligibility of the applicant or other such reason. I base my opinion on the fact that when an official allotment selection has been duly made in accordance with the laws and regulations at the time of the selection, in ordinary circumstances the selector acquires a certain property interest in the land and a right to the perfection of his title which courts will protect."

We do not agree, however, that there is either legislative or judicial authority for the qualification that the allotment selections must be "in accordance with a course of allotment on the reservation" in order to be binding upon the Secretary. Particularly inappropriate would such a qualification be where, as here, there had been no previous schedules that had received the Secretary's approval. The crucial question is whether or not the statutes and the Departmental regulations and instructions were followed by the allotting agent. That this was done by Wadsworth in preparing the 1927 schedule is not disputed.

As we read the authorities, then, the Secretary's powers regarding an allotment to a Mission Indian are twofold:

■ 1. As to "whether the selector is acting within the law, in respect of * * the land * * * selected," the Secretary's authority is "judicial in its nature." Payne v. New Mexico, supra, 255 U.S. at page 371. So is his power as "to disapproving particular selections not entitled to approval because of error or the ineligibility of the applicant or other such reason." Fort Peck Indian Reservation, supra, 57 I.D. at pages 18-19. No such illegality, "error", or "ineligibility" has been shown in the instant case. The Secretary's ostensible objections to the 1927 schedule were based upon "inequity": his underlying opposition probably was due to a dislike for

allotments in general, at least as far as these Indians were concerned. Neither reason was sufficient as a basis for his disapproval of the schedule on "judicial" grounds. His instructions to Wadsworth had been scrupulously carried out. He could not change his mind, and decide that there should be no allotments.

■ 2. Once the regularity and the legality of a schedule, in every respect, are established, the Secretary's duty as to approving the schedule and granting patents thereunder becomes *ministerial.*

If, however, the Supreme Court's opinion in the Arenas case be interpreted to "point the way" to a third power enjoyed by the Secretary—namely, that of exercising discretion as to the approval of a schedule regularly and lawfully prepared in accordance with his own instructions—under the record in the instant case we hold that such discretion was abused. The abuse resulted from the promises made to the Indians by Wadsworth, the Secretary's agent; from the Secretary's own neglect of the schedule and his inordinate delay in reaching a decision thereon; and, finally, by the specious and colorable reasons given for the disapproval of the allotments, when the record clearly shows that the Secretary's real objection was not to the carefully compiled individual schedule of 1927 but to the general Congressional "policy of allotment".

Testing the "full record" in this case in the crucible of the foregoing legal principles, we find that there emerge the following decisive facts regarding the 1927 schedule:

1. The appellee and his wife, Guadaloupe Arenas, were duly enrolled and recognized members of the Palm Springs or Agua Caliente Band of Mission Indians of California. [R. 45]

2. In a letter dated March 19, 1927, the appellee and his wife requested of the Commissioner of Indian Affairs, through H. E. Wadsworth, the duly appointed special allotting agent at large, that each be given allotments of land on the Palm Springs Indian Reservation. [R. 48-49, 532-533]

3. Certificates of selections for allotment on that reservation for the appellee and his wife were delivered to them by

Wadsworth. [R. 159] Both had done all that was necessary and all that they could do to become entitled to the land.

4. The allotments and the schedule thereof were prepared by Wadsworth in accordance with instructions of the Department of the Interior, and under the provisions of the Act of February 8, 1887 (24 Stat. 388), as amended by the Act of June 25, 1910 (36 Stat. 855) and supplemented by the Act of March 2, 1917 (39 Stat. 969-976). The Indians whose names appeared on the schedule had signed written requests that the lands selected be allotted to them and that trust patents be issued therefor, [R. 582-583] in compliance with requirements of Department approval.

5. On August 29, 1928, Charles H. Burke, at that time Commissioner of Indian Affairs, recommended that the 1927 schedule be approved and that the Commissioner of the General Land Office be authorized, to issue trust patents for the allotments noted thereon, with the exception of five allotment selections not pertinent here. [R. 582-585]

6. In a memorandum dated April 24, 1929, submitted to the Commissioner of Indian Affairs by D. K. Parrott, Acting Assistant Commissioner of the General Land Office, it was stated that, except for certain modifications not relevant here, "no reasons [were] known why the schedule should not be approved and trust patents issued as recommended." [R.573]

7. Following the decision of the Supreme Court in the Arenas case, supra, which admittedly took from the Secretary of the Interior "discretion as to whether allotments should be made at all on the Palm Springs Reservation" the schedule, after having lain in the offices of the Department of the Interior for 17 years without having even been "considered" by the Secretary [R.327], was disapproved by Assistant Secretary Oscar L. Chapman on December 14, 1944. The disapproval was based upon a lengthy letter from Commissioner Collier, who suddenly found much fault with the neglected schedule. (R.340; 327-340)

■ We therefore hold that the appellee has acquired an equitable title to the lands covered by his selection for allotment and the certificate therefor issued by Wadsworth. In the language of the Supreme Court, "he is entitled to have completed the all but fully executed policy of allotment" laid down by Congress. In accordance with the prayer of his third amended complaint, an allotment trust patent to the lands covered by his certificate of selection for allotment should be issued to him by the United States, [R. 24, 158-160] as of the date of the schedule of selections for allotment, May 9, 1927. [R.49]

We turn next to the appellee's claims to trust patents to the lands covered by the certificates of selections for allotment issued to Guadaloupe, his wife; Francisco, his father; and Simon, his brother. He bases these claims upon the ground that he is their "sole heir at law, and next of kin." [R.12,17,22] His heirship and his kinship were testified to by the appellee in the court below [R. 192, 202, 207, 227], were found as facts [R. 69, 73, 77] by the trial judge, and, indeed, are not denied in the appellant's briefs. The appellant contends, however, that the appellee cannot for other reasons obtain trust patents based on his deceased relatives' certificates of selections.

■ As we have seen, "the owner of an allotment selection, even before its approval, has an inheritable interest." Fort Belknap Indian Reservation, supra, 55 I.D. at Page 303, cited by the Supreme Court in the Arenas case, supra; Fort Peck Indian Reservation, supra, 57 I.D. at Page 19.

Guadaloupe died on March 26, 1937. [R. 49] Through a misapprehension, in its opening brief the appellant stated that she had died on March 26, 1927 [R. 36], and proceeded to argue that, even though she had requested an allotment, since her death occurred before the 1927 schedule was made out and transmitted she "had only a personal right which perished with her". When its error was brought to its attention, however, the appellant, in its reply brief, withdrew that section of its opening brief dealing with the quality of Guadaloupe's interest in the land covered by her selection for allotment. In other words, the appellant thereby has conceded, as in-

deed it must, that Guadaloupe's rights under the 1927 schedule were on a parity with the rights, if any, enjoyed thereunder by the appellee himself.

We therefore hold that the appellee has inherited Guadaloupe's equitable rights under her certificate of selection for allotment and the inclusion of her name in the 1927 schedule.

On a different footing, however, stand the claims of the appellee, as heir, to the lands covered by the purported selections for allotment made out by Wadsworth in favor of Francisco and Simon. It will be remembered that the latter two Indians died long before the 1927 schedule was even contemplated—on October 4, 1924, and February 18, 1925, respectively. Since their names were included under both the 1923 and the 1927 schedule, we will briefly consider their rights under each.

The record shows and the court found that Francisco and Simon, together with the appellee and Guadaloupe, protested in 1923 against the making of allotments, and that at least three of them refused their certificates of selections and caused them to be returned to Wadsworth by the postal authorities. [R. 176-180] The return of these certificates is specifically included in the lower court's findings of fact, [R. 65, 69, 78] except in the case of Francisco, as to whom the court found that the evidence was not clear. [R. 74] In its opinion, however, the lower court stated that "Francisco Arenas did not accept his certificate of allotment, and these four allotment certificates remained in the possession of Mr. Wadsworth until he retired from the Government service in 1930." 60 F.Supp. at page 415. When Francisco's original certificate was introduced in evidence, Wadsworth, in answer to a question as to how it was returned to him, replied that he did not remember. [R. 179] Our own independent study of the record inclines us to the belief that Francisco, like his three relatives, returned his certificate of selection for allotment to Wadsworth, regardless of the mechanical means by which that return was effected. In any event, it is incumbent upon the appellee to establish by a preponderance of evidence that the persons to whose equitable titles he claims to succeed did all that was necessary and all that they could do to become entitled to the land. Otherwise he cannot bring himself within the doctrine announced in the Fort Belknap case, supra, which was cited with approval by the Supreme Court in the Arenas case, supra.

Be that as it may, it is beyond cavil that Wadsworth, in attempting to allot the lands to Francisco as well as Simon, made the selections for each of them. The evidence in this case establishes the fact, and in his brief the appellee admits it. [R. 172]

In our view, Wadsworth had no power to do this without *specific* authorization from the Secretary of the Interior. The record fails to show that he had such authorization, nor does the appellee point to any such specific authority from the Secretary. On the contrary, he relies upon the following *general* grant of power, contained in Section 2 of the General Allotment Act of 1887, appearing without change in 25 U.S.C.A. § 332 as follows:

"*§ 332. Selection of allotments.* All allotments set apart under the provisions of sections 331 to 334, inclusive, and 336 shall be selected by the Indians, heads of families selecting for their minor children, and the agents shall select for each orphan child, and in such manner as to embrace the improvements of the Indians making the selection. Where the improvements of two or more Indians have been made on the same legal subdivision of land, unless they shall otherwise agree, a provisional line may be run dividing said lands between them, and the amount to which each is entitled shall be equalized in the assignment of the remainder of the land to which they are entitled under said sections: Provided, That if any one entitled to an allotment shall fail to make a selection within four years after the President shall direct that allotments may be made on a particular reservation, the Secretary of the Interior may direct the agent of such tribe or band, if such there be, and if there be no agent, then a special agent appointed for that purpose, *to make a selection for such Indian, which selection shall be allotted as in cases where selections are made by the Indians,*

*and patents shall issue in like manner."* (Feb. 8, 1887, c. 119, § 2, 24 Stat. 388). [Emphasis supplied by the appellee.]

It will be observed that the section has never been amended, since its original enactment in 1887. We have preserved the appellee's italicization for the reason that we believe that it indicates his misconstruction of this section. He emphasizes the allotting agent's power to make selections for the Indians, but overlooks the condition precedent to the exercise of that power; namely, *"the Secretary of the Interior may direct the agent of such tribe or band, if such there be, and if there be no agent, then a special agent appointed for that purpose, to make a selection for such Indian,"* etc.

As the appellee points out, the Act of 1917 directed that allotments be made to the Mission Indians in severalty, and made unnecessary any Presidential direction. We have already quoted the Supreme Court's construction of that statute as affecting the Secretary's discretion as to whether or not the Indians "had the capacity for individual responsibility for land ownership."

But nothing in the Act of 1917 or the construction thereof by the Supreme Court takes from the Secretary the authority to determine what *method* of allotment shall be followed. Indeed, as we have seen, the Supreme Court has plainly stated that "We assume the Secretary's complete control of the method."

Under Section 2 of the General Allotment Act, quoted above, there must be a *specific direction* from the Secretary to the agent in charge of the allotments that he make selections for Indians who fail to choose for themselves. The record here is barren of any evidence that the Secretary authorized Wadsworth, or Ellis, or anyone else to make the selections for the Indians who refused to do so.

 It might be observed, in passing, that any statute authorizing the Secretary to force land in severalty upon the Indians should be strictly construed. Such legislation is in derogation of the general principles of law, which do not favor compul-

sory ownership of land—especially by persons in a restricted civil status.

Indeed, the court below, which seems to have been [R. 168, 189] impressed with Wadsworth and his "good memory," felt compelled to say frankly:

"Special Allotting Agent, H. E. Wadsworth, on or about June 21, 1923, evidently being of the opinion that the Indians' likes and dislikes had nothing to do with their receiving their allotments, and that they would be thrust upon them regardless of their wishes in the matter, concluded the preparation of a schedule," etc. 60 F.Supp. at page 415.

The foregoing passage clearly indicates that Wadsworth was acting "on his own" when he made the selections for the Indians, and did not have the required special authorization from the Department for doing so.

The Supreme Court's holding in this respect is unequivocal, specific and emphatic:

"Wadsworth was appointed General Allotment Agent and was sent to the Indians *with instructions to permit them to select their own allotments*. When he selected for those who did not choose for themselves, his schedule was disapproved, *and only for that reason."* [Emphasis supplied.] 322 U.S. at page 426, 64 S.Ct. at page 1093, 88 L.Ed 1363.

 Accordingly, we hold that none of the four Indians whose titles are involved in this case acquired any equitable rights under the allotment schedule of June 21, 1923.

As to the 1927 schedule, we have already adjudicated the equitable titles acquired thereunder by the appellee and his wife, Guadaloupe. There remain to be considered the rights to a trust patent that it gave to Francisco and Simon.

Both these latter Indians were dead at the time that Wadsworth prepared and submitted the schedule.

In La Roque v. United States, 239 U.S. 62, 66, 36 S.Ct. 22, 24, 60 L.Ed. 147, after quoting from the General Allotment Act of 1887, the Supreme Court said:

"We think the terms of the general act contemplated only selections on the part of

living Indians, acting for themselves or through designated representatives. The express provision for selections in behalf of children and of Indians failing to select for themselves, and the absence of any provision in respect of Indians dying without selections, are persuasive that no selections in the right of the latter were to be made. In other words, as to them there was no displacement of the usual rule that the incidents of tribal membership, like the membership itself, are terminated by death. [Cases cited.]"

It is true that in the instant case, in a letter dated March 14, 1927, Commissioner Burke instructed Wadsworth as follows:

" * * * you are advised that it will not be necessary to obtain the consent of living allottees or prospective heirs of deceased allottees to the approval of selections regularly made for Indians now deceased. In revising the schedule you should include all such selections appearing on the schedule previously submitted, and note the fact of the death of the allottee in the column headed 'remarks'." [R. 244.]

Even the instructions of the Indian Commissioner to a subordinate, however, cannot transcend a Congressional mandate, as construed by the highest court in the land.

We therefore hold that neither Francisco nor Simon Arenas acquired any equitable rights to a trust patent under either the 1923 or the 1927 schedule. Not having any such rights, of course, they could transmit none to the appellee.

Finally, the appellant complains that in the closing paragraph of its judgment the court below stated that it retained jurisdiction "for the purpose of adjudicating the reasonable sums that shall be allowed and paid to the attorneys of record for plaintiff for their services rendered to him in this action and for expenses necessarily incurred by them in his behalf in the prosecution thereof, and for the purpose of making all necessary and proper orders, judgments and decrees for the securing and payment of all such sums so found due and owing by the plaintiff to said attorneys."

The appellant objects that "Presumably, it was intended that thereafter judgment would be entered against the United States for such expenses," and points out that the Act of 1894, supra, "by which the United States consented to this suit, does not authorize the imposition of liability for costs or other expenses of litigation against the Government."

We agree entirely with the appellant's construction of the Act of 1894 [25 U.S.C.A. § 345]. The difficulty with the appellant's argument, however, is that it has no application to the case at bar.

The judgment of the court below seeks to impose no liability for any expenses of litigation upon any one, certainly not the United States. The appellant does not question the court's right to leave the case open for such future action as it may deem proper: the objection is that "presumably" the lower court is planning to mulct the Government for the appellee's attorneys' fees.

There is neither internal nor external evidence that the judgment reflects any such intention, or any other unlawful or unfair intention. So far as the appellant is concerned, any objection to this paragraph of the judgment is not only premature, but moot. For this reason, this Court refrains from making any ruling on the subject.

That portion of the judgment which holds that the appellee is entitled to a trust patent for his allotment and for that of his wife, Guadaloupe Arenas, to be effective as of June 21, 1923, is modified so as to make the effective date May 9, 1927; and, as modified, that portion of the judgment is affirmed.

That portion of the judgment which holds that the appellee is entitled to a trust patent for the allotments purported to have been made to Francisco and Simon Arenas by either the 1923 schedule or the 1927 schedule is reversed.

Affirmed in part and reversed in part.