Amos A. HOPKINS (Dukes) et al., Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 21456.

United States Court of Appeals Ninth Circuit.

May 19, 1969.

Fred W. Gabourie (argued), of Merdler & Gabourie, Sherman Oaks, Cal., for appellants.

Raymond N. Zagone, Washington, D. C. (argued), Shiro Kashiwa, Asst. Atty. Gen., S. Billingsley Hill, Atty., Dept. of Justice, Washington, D. C., Richard J. Dauber, Asst. U. S. Atty., Wm. M. Byrne, Jr., U. S. Atty., Los Angeles, Cal., for appellee.

Richard B. Collins, Jr., George F. Duke, Lee J. Sclar, Santa Rosa, Cal., Calif. Indian Legal Services, Inc., amicus curiae.

Before BARNES and BROWNING, Circuit Judges, and * McNICHOLS, District Judge.

* Honorable Ray McNichols, District of Idaho, sitting by designation.

BROWNING, Circuit Judge:

Each plaintiff-appellant filed an application with the Department of Interior for an Indian allotment of 160 acres of grazing lands in the public domain under section 4 of the General Allotment Act of 1887, as amended, 25 U.S.C. § 334.

Seven applications were rejected by the District Land Office on the ground that the lands had been ordered sold pursuant to 43 U.S.C. § 1171, and notice of this order had been published prior to the filing of the applications. *See* 43 C.F.R. § 2243.1–6. The applicants were informed of their right to appeal the District Land Office's decision to the Director of the Bureau of Land Management. They did not appeal.

The remaining twenty-six applications were rejected by the Secretary of Interior on the ground that the land applied for was not proper for allotment under the General Allotment Act because it did not constitute an economic grazing unit upon which the applicant could make a home and earn a livelihood raising livestock.

The applicants filed the present suit in the district court to require allotment of the lands. The court granted summary judgment dismissing the action. The court held that it lacked jurisdiction to review rejection of the first group of applications because the applicants had not exhausted their administrative remedy. It held that judicial review of rejection of the remaining applications was barred by 5 U.S.C. § 701(a) (2), because

classification of lands for allotment under the General Allotment Act was action committed to the discretion of the Secretary of Interior by section 7 of the Taylor Grazing Act, 43 U.S.C. § 315f. The court went on to hold that, assuming jurisdiction to review the rejection of the second group of applications, the administrative record demonstrated that the Secretary's action was based upon a reasonable construction of the statutes, and was not arbitrary, capricious, or in bad faith.

We deal first with the district court's treatment of the second group of applications.

■ 25 U.S.C. § 345 and 28 U.S.C. § 1353 give district courts original jurisdiction of actions involving the right to an allotment under the General Allotment Act. Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 368, 88 S.Ct. 982, 19 L.Ed. 2d 1238 n. 5 (1968); Arenas v. United States, 322 U.S. 419, 429–430, 64 S.Ct. 1090, 88 L.Ed. 1363 (1944); United States v. Payne, 264 U.S. 446, 44 S.Ct. 352, 68 L.Ed. 782 (1924); Wise v. United States, 297 F.2d 822, 823 (10th Cir. 1961). Plaintiffs' contention that the Secretary exceeded the powers conferred upon him by the governing statutes [1] is subject to judicial review in such a suit. Arenas v. United States, *supra*, at 432, 64 S.Ct. 1090; Wise v. United States, *supra*, 297 F.2d at 823.

Plaintiffs' basic premise is that section 4 of the General Allotment Act,[2] as amended, grants a non-reservation Indian who has made settlement upon 160

---

1. Since only legal issues were presented, disposition by summary judgment was proper. Plaintiffs assert the contrary, but point to no genuine issue as to material facts.

2. Section 4 of the General Allotment Act of 1887, as amended, 25 U.S.C. § 334, reads, in part, as follows:

Where any Indian not residing upon a reservation, or for whose tribe no reservation has been provided by treaty, Act of Congress, or Executive order, shall make settlement upon any surveyed or unsurveyed lands of the United States not otherwise appropriated, he or she shall be entitled,

upon application to the local land office for the district in which the lands are located, to have the same allotted to him or her, and to his or her children, in quantities and manner as provided in sections 331–334, 339, 341, 342, 348, 349 and 381 of this title for Indians residing upon reservations; and when such settlement is made upon unsurveyed lands the grant to such Indians shall be adjusted upon the survey of the lands so as to conform thereto; and patents shall be issued to them for such lands in the manner and with the restrictions as provided in sections 348 and 349 of this title.

acres of grazing lands [3] in the public domain the unconditional right to have the lands allotted to him upon application to the local land office in which the lands are located. They assert that they have satisfied all of the other requirements of the statute, but have been prevented from settling upon the lands by the Secretary. They conclude that the Secretary acted unlawfully in denying them their statutory allotments because the lands would not provide a livelihood from grazing. Essentially the same contention was recently rejected in Finch v. United States, 387 F.2d 13 (10th Cir. 1967).

■ The main purpose of the General Allotment Act was to end the tribal and nomadic life of the Indians by allotting a portion of reservation lands in severalty to each Indian residing on a reservation, and selling off the excess lands. The Indians were to be established as individual settlers on separate allotments of land gaining a livelihood by pastoral pursuits.[4]

Congress recognized, however, that not all Indians were prepared for transition to the life of an independent settler living on and from his privately owned tract of land, and that not all lands were suitable for this purpose. Therefore, section 1 of the General Allotment Act, as amended, 25 U.S.C. § 331 (see note 2), did not require allotment in severalty of all reservation lands, but instead provided that as to each reservation "the President shall be authorized to cause the same or any part thereof to be surveyed or resurveyed whenever in his opinion such reservation or any part may be advantageously utilized for agricultural or grazing purposes by such Indians, and to cause allotment to each Indian located thereon to be made in such areas as in his opinion may be for their best interest * * *."

■ It is apparent from this provision of section 1 of the General Allotment Act that Congress did not intend that an Indian should acquire a vested

3. Section 1 of the General Allotment Act, as amended, 25 U.S.C. § 331, referred to in the text of § 4, reads in part as follows:

In all cases where any tribe or band of Indians has been or shall be located upon any reservation created for their use by treaty stipulation, Act of Congress, or Executive order, the President shall be authorized to cause the same or any part thereof to be surveyed or resurveyed whenever in his opinion such reservation or any part may be advantageously utilized for agricultural or grazing purposes by such Indians, and to cause allotment to each Indian located thereon to be made in such areas as in his opinion may be for their best interest *not to exceed eighty acres of agricultural or one hundred and sixty acres of grazing land* to any one Indian. And whenever it shall appear to the President that lands on any Indian reservation subject to allotment by authority of law have been or may be brought within any irrigation project, he may cause allotments of such irrigable lands to be made to the Indians entitled thereto in such areas as may be for their best interest, not to exceed, however, forty acres to any one Indian, and such irrigable land shall be held

to be equal in quantity to twice the number of acres of nonirrigable agricultural land and four times the number of acres of nonirrigable grazing land: *Provided,* That the remaining area to which any Indian may be entitled under existing law after he shall have received his proportion of irrigable land on the basis of equalization herein established may be allotted to him from nonirrigable agricultural or grazing lands * * *. (emphasis added).

4. H.Rep. 1576, 46th Cong., 2d Sess. 2, 6; 11 Cong.Rec. 906 (Jan. 25, 1881); 15 Cong.Rec. 190–91; 8 Interior Dec. 647, 650 (1889); Instructions, 48 Interior Dec. 41, 43, 45 (1921); Comment, Indians: Better Dead than Red?, 42 So.Cal.L.Rev. 101, 107–08 (1968); Note, The Indian: The Forgotten American, 81 Harv.L.Rev. 1817, 1851 (1968); Gilbert & Taylor, Indian Land Questions, 8 Ariz.L.Rev. 102, 111–12 (1966); Otis, History of the Allotment Policy, Hearings Before the House Comm. on Indian Affairs, 73d Cong., 2d Sess. 450, 460, 462, 483 (1934) [hereafter Otis, History]; Brophy & Aberle, The Indian, America's Unfinished Business 19 (1967); Gates, History of Public Land Law Development 453–54, 464 (1968).

right to an allotment simply by selecting land, settling upon it, and then filing an application under the Act. Such a right could not arise until the President, acting through the Secretary of Interior, made the determinations required by section 1 of the Act. And the legislative history of the Act supports the conclusion that one of the standards to be applied by the Secretary in making the determinations required by section 1 is whether the reservation lands selected for allotment are capable of yielding support for an Indian settler and his family. If the lands are too poor to accomplish this purpose, the Secretary is not to approve the allotment.[5]

██ Section 4 of the General Allotment Act, applicable to Indians *not* residing on a reservation, is to be read with the same limitations. This section expressly provides that allotments to non-reservation Indians are to be made in the same "quantities and manner" as allotments to reservation Indians under section 1.[6] Moreover, the legislative purpose to authorize allotments only upon lands which the Secretary determined could provide a home and furnish a livelihood by farming, raising livestock, or both, applies to the General Allotment Act as a whole.

Section 4 of the General Allotment Act has long been so construed by the Secretary of Interior,[7] and is so construed today.[8] Judicial authority is to the same effect.[9]

5. 17 Cong.Rec. 1630, 1631, 1632 (Feb. 19, 1886). *See also* 11 Cong.Rec. 779, 782 (Jan. 20, 1881) (Feb. 15, 1881); 18 Cong.Rec. 190–91 (Dec. 15, 1886).

It is clear that allotments sought by or on behalf of all members of an Indian family are to be aggregated in order to determine the economic viability of the resulting unit. Otis, History 474; 18 Cong.Rec., *supra*, at 192. Contrary to the suggestion of the amicus, the Secretary followed this course in the present case.

6. Moreover, § 4 of the Act of Feb. 28, 1891, 26 Stat. 795, as amended, 25 U.S.C. § 336, which apparently overlaps § 4 of the General Allotment Act, 25 U.S.C. § 334, provides that an Indian entitled to allotment who makes settlement on public lands shall "have the same allotted to him * * * in the manner as provided by law for allotments to Indians residing upon reservations, and such allotments to Indians on the public domain as herein provided *shall be made in such areas as the President may deem proper* * * *" (emphasis added).

7. Two early Interior Department Regulations provided that the right to an allotment under § 4 was dependent upon a prior determination by the Department that the lands sought were of the character contemplated by the Act, *see, e. g.*, Regulations Issued June 15, 1896, 22 Interior Dec. 709; Regulations Issued June 27, 1899, 28 Interior Dec. 569. The theory that a vested right to an allotment arises upon the filing of an application was specifically rejected in Allotment Selections on the Fort Belknap Indian Reservation, 55 Interior Dec. 295, 303 (1935); Regulations dated Feb. 1, 1928, 52 Interior Dec. 383, 385 (1928); Clark v. Benally, 51 Interior Dec. 91, 101 (1925). *See also* Cohen, Handbook of Federal Indian Law 107–08 (1945).

With regard to the standards to be applied, Secretary Hitchcock advised the Commissioner of the General Land Office on Feb. 21, 1903, that allotment under § 4 was appropriate "provided the allotment contains sufficient arable land to support an Indian family and is on the whole suitable for a home for the allottee and is applied for in good faith for that purpose." 32 Interior Dec. 17, 19. Earlier regulations indicated that applications under § 4 were to be rejected where "the land embraced in an allotment is not of the character contemplated by the allotment act," but did not set out the criteria to be applied. Indian Lands—Allotments. Regulations June 15, 1896. 22 Interior Dec. 709. *See also* Regulations of June 27, 1899, 28 Interior Dec. 569.

8. In addition to the decisions in the present cases, *see* John E. Balmer, 71 Interior Dec. 66, 67–68 (1964); Amos A. Hopkins (Dukes), Colorado 0112669, Dec. 20, 1963 (unreported); 43 C.F.R. § 2410.1–3(d) (6) (iii) (1968).

9. Finch v. United States, 387 F.2d 13, 15–16 (10th Cir. 1967); Daniels v. United States, 247 F.Supp. 193, 195–196 (W.D. Okl.1965). As to applications under § 1, see Wise v. United States, 297 F.2d 822, 825–826 (10th Cir. 1961); Lemieux v. United States, 15 F.2d 518, 521 (8th Cir. 1926).

Plaintiffs point to one possible departure from the long standing interpretation of section 4 as requiring that the lands allotted be sufficiently productive to support an Indian family. Regulations issued by the Department of Interior on February 1, 1928, contained the following statement: "Where an Indian makes settlement in good faith upon lands not reserved therefrom, an allotment therefor can not be denied on the ground that the lands are too poor in quality." 52 Interior Dec. 383, 387.[10] Taken alone and literally, this statement is inconsistent with the meaning of section 4 of the General Allotment Act reflected in legislative history and prior and subsequent departmental interpretations. However, the statement's textual and historical context suggests a narrower reading.

In 1928, when the regulations containing the statement were issued, the public domain was open to selection, settlement, and entry under various public land laws without a prior determination by the Department of Interior that the lands selected were proper for entry and settlement under the applicable statute. Indeed, by the express terms of section 4 of the General Allotment Act, entry and settlement were preconditions to application and allotment under that section. In practice, therefore, an applicant for allotment was required to locate suitable lands, occupy them, and put them to use, before applying for allotment.

In this context the Department decided Clark v. Benally, 51 D.D. Interior Dec. 91 (1925), the apparent source of the statement in the regulations of February 1, 1928. There, the Indian applicant had used and occupied the land, maintaining a flock of 325 sheep, for five years prior to his application for an allotment. A competing applicant for a permit to prospect for oil and gas upon the same lands filed affidavits which described the general area as rocky, barren, and arid, and asserted that lands both east and west of the proposed allotment were better suited for grazing. As the Department pointed out, however, sufficient water was available on the lands sought, and large areas of adjacent range were open to grazing. The Department noted that "[t]he Navajo has supported himself as a herdsman for several hundred years, and his ability to select good grazing land should not be questioned." The Department concluded, "[i]nasmuch as these Indians have voluntarily made settlement upon certain lands not in any manner reserved therefrom, the Department can not *arbitrarily* deny them allotments on the ground that the lands are too poor in quality" (emphasis added).

The substance of the holding in Clark v. Benally is that where a qualified Indian applicant has demonstrated that particular lands can provide a home and livelihood by actually occupying and successfully using those lands, it would be arbitrary for the Department to refuse to allot the lands on the basis of generalized affidavits characterizing the land as too poor in quality.[11] Obviously this ruling is consistent with the interpretation of section 4 of the General Allotment Act as *requiring that lands allotted be capable of supporting an Indian settler.*

Taken as a whole, the regulations of February 1, 1928, are also consistent with this meaning, for they condition allotment under section 4 of the General Allotment Act upon reasonable use and occupation of lands which profitably can be devoted to grazing.

10. The substance of the statement is retained in the present regulations 43 C.F.R. § 2212.0–7(a) (3) (1968). The Department's position is that the regulation is applicable only where settlement was made upon the lands sought prior to 1934, when the public domain was closed to settlement prior to application and classfication. See note 11.

11. The problem dealt with in Clark v. Benally could only arise where settlement was made prior to 1934. After 1934 settlement upon public domain lands was not permitted until the Secretary had first classified the land as proper for allotment under § 4 of the General Allotment Act. *See* 43 C.F.R. § 2212.0–3 (b) (1968).

Plaintiffs assert that it is impossible to obtain a livelihood by raising livestock on the maximum quantity of grazing land which may be allotted under section 4 of the General Allotment Act,[12] and argue that to condition allotment upon a determination that the lands selected are capable of supporting the applicant renders meaningless the Act's provision for allotment of grazing land.

The same contention was made by opponents of the Act in the congressional debates preceding its adoption. Senator Dawes, speaking for the Act's proponents, responded (17 Cong.Rec. 1631 (Feb. 19, 1886)):

> If the Indian can not be made to support himself on the grazing land, then the Secretary of the Interior will not plant him on it. But there is a great extent of territory, half of which is grazing land and part of which is agricultural land; and a wise arrangement of this matter would be to give the Indians who have an inclination to raise cattle a small portion of agricultural land and a larger portion of grazing land connected with it, sufficient for each Indian not only to maintain himself but to encourage him and his family to make themselves independent.[13]

In short, the emphasis of the allotment policy was laid upon farming, with grazing as an incidental activity.[14] Even so, it may well be that the quality of available land was such that the maximum quantity which could be allotted under the Act was insufficient to support the Indian allottees.[15] But the deliberate judgment of Congress was to the contrary, and it was a judgment for Congress to make.

■ Since we conclude that the standard which the Secretary applied in rejecting the second group of applications was based upon a reasonable construction of section 4 of the General Allotment Act.[16] and since the plaintiffs do not challenge the factual finding that the lands were unsuitable for allotment under this standard,[17] any technical de-

---

12. As enacted, § 1 of the General Allotment Act provided for the allotment "to each head of a family, one quarter of a section [160 acres]; to each single person over eighteen years of age, one-eighth of a section; to each orphan child under eighteen years of age, one-eighth of a section; and to each other single person under eighteen years of age now living, or who may be born prior to the date of the order of the President directing an allotment of the lands embraced in any reservation, one-sixteenth of a section," which was "advantageous for agricultural or grazing purposes." 24 Stat. 388.

In its present form, the section provides for the allotment of "not to exceed eighty acres of agricultural or one hundred and sixty acres of grazing land to any one Indian." Each Indian may receive up to forty acres of irrigable land, and such land is to be treated as equal to twice the quantity of nonirrigable agricultural land and four times the quantity of nonirrigable grazing land. See note 3. Since the allotments are to be made on an individual basis, the total available to an Indian family depends upon the number of persons in the family. See note 5.

13. *See also* 11 Cong.Rec. 1031 (Jan. 29, 1881).

14. Otis, History 467.

15. Otis, History 467; Comment, Indians: Better Dead than Red, 42 So.Cal.L.Rev. 101, 116 (1968).

16. *See* Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). "When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.'"

17. Plaintiffs do assert that the Secretary did not consider the possibility of using the most modern methods of production; and amicus (the California Indian Legal Services, Inc., which filed a helpful brief with permission of the court) suggests that the Secretary gave no consideration to the possibility of raising stock by purchased feed, or of raising barnyard animals. These criticisms are not well founded. The record reflects a fair attempt by the Secretary to evaluate the present potential of the lands as an economic unit for the raising of livestock, using any practicable means.

ficiency in the administrative procedures would appear to be at best harmless error.[18]

We consider, nonetheless, plaintiffs' contention that the Secretary acted beyond his authority in denying them an opportunity to settle upon the lands until he had first determined whether the lands qualified for allotment under section 4.

Authority to withdraw "any of the public lands of the United States" from settlement and to reserve the same for "classification" was conferred upon the President by the Act of June 25, 1910, c. 421, § 1, 36 Stat. 847, 43 U.S.C. § 141. The statute provides that "such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress." Acting pursuant to this authority, the Secretary of Interior, by Executive Order 6910, November 26, 1934, and Executive Order 6964, February 5, 1935, withdrew all public lands in the ten western states from settlement and reserved those lands for classification, pending determination of the most useful purpose to which the lands might be put.

Section 7 of the Taylor Grazing Act, as amended, 43 U.S.C. § 315f, authorized the Secretary "to examine and classify" any of the withdrawn lands "which are more valuable or suitable for the production of agricultural crops than for the production of native grasses and forage plants, or more valuable or suitable for any other use than for the use provided for under this chapter [19] * * * and to open such lands to entry, selection, or location for disposal in accordance with such classification under applicable public-land laws * * *." The section further provides that the withdrawn lands "shall not be subject to disposition, settlement, or occupation until after the same have been classified and opened to entry" by the Secretary of Interior upon application by a qualified applicant.[20]

Since the lands involved here were public domain lands, these executive orders and statutes would appear to authorize the administrative requirement that settlement be preceded by a classification of the lands as suitable for allotment under section 4 of the General Allotment Act.

As plaintiffs point out, this interpretation results in the implied repeal of the portion of section 4 of the General Allotment Act which required settlement as a precondition to application and allotment. However, the presumption against *sub silentio* repeal is a rule of interpretation based upon probable congressional intention, and, as such, has limited application here. Repeal of Indian legislation by implication is a common congressional practice.[21] Moreover,

---

18. Braniff Airways, Inc. v. Civil Aeronautics Bd., 126 U.S.App.D.C. 399, 379 F.2d 453, 465–466 (1967); NLRB v. Seine & Line Fishermen's Union, 374 F.2d 974, 981 (9th Cir. 1967); Kerner v. Celebrezze, 340 F.2d 736, 740 (2d Cir. 1965).

19. The use provided was "to establish grazing districts * * * of vacant, unappropriated, and unreserved lands from any part of the public domain * * * which in [the Secretary of Interior's] opinion are chiefly valuable for grazing and raising forage crops * * *." Section 1 of the Taylor Grazing Act, June 28, 1934, c. 865, § 1, 48 Stat. 1269, as amended, 43 U.S.C. § 315.

20. As enacted, the Taylor Grazing Act applied to a maximum of 80 million acres of the public domain. A 1936 amendment removed the acreage limitation.

*Compare* Act June 28, 1934, c. 865, § 7, 48 Stat. 1272, *with* Act June 26, 1936, c. 842, Title I, § 2, 49 Stat. 1976, 43 U.S.C. § 315f. See Hearings on S. 2539, 74th Cong., 1st Sess. 51 (1935).

21. Brophy & Aberle, The Indian 122–23 (1967); Comment, 42 So.Cal.L.Rev., *supra*, at 107. To cite one example, § 1 of the Act of July 18, 1934, c. 576, § 1, 48 Stat. 984, 25 U.S.C. § 461, ended the allotment in severalty of lands on Indian reservations. "To that extent, the act was incompatible with and, therefore, supplanted all prior laws, both general and special, purporting to authorize allotments in severalty in any form on any reservation to which the act applied, and this notwithstanding the fact that the act contained no general repeal provision." U.S. Dep't of Interior, Federal Indian Law 778 (1966).

the legislative history demonstrates that Congress was aware that the Taylor Grazing Act changed existing law by conditioning entry and settlement upon the Secretary's prior classification of the lands as suitable.[22]

The amicus brief raises the serious question whether the Taylor Grazing Act, if applied to section 4 of the General Allotment Act, would not repeal by implication the latter's provision for the allotment of grazing lands, as distinguished from agricultural lands.

The argument is as follows. Section 7 of the Taylor Grazing Act, 43 U.S.C. § 315f, in conjunction with section 1, 43 U.S.C. § 315, may be read as authorizing the classification of lands for entry and settlement *only* if they are more valuable for the production of agricultural crops than for grazing. There is substantial evidence in the legislative history that Congress intended by these provisions to end homesteading of land suitable only for grazing.[23] The view expressed was that even 640 acres of such lands would not provide a livelihood for an individual settler,[24] and that it would be preferable to retain the grazing lands that remained in public ownership for control and management in the public interest.[25] It is true that allotments under section 4 of the General Allotment Act were not mentioned in the hearings and debates on the Taylor Grazing Act. In view of the broad purposes of the latter Act, however, and the

relative insignificance of such allotments, it is likely that the omission is attributable to oversight rather than to an intention to create an unexpressed exception to the general language of the statute. Cf. Finch v. United States, 387 F.2d 13, 15 (10th Cir. 1967).

On the other hand, statutes affecting the rights of Indians are generally to be construed in their favor; and the provision in section 7 of the Taylor Grazing Act permitting the Secretary to classify lands as "more valuable or suitable for *any other use*" than for inclusion in a grazing district may afford a basis for holding that the Secretary has authority under section 7 to classify grazing land as suitable for allotment under section 4 of the General Allotment Act.[26]

We need not decide the question in this case, however, since the Secretary assumed that grazing lands might still be allotted under section 4 of the General Allotment Act, and rejected the second group of applications solely because the land would not provide support for the applicants. It is only necessary for us to hold—and we do—that the possibility of an implied repeal of the grazing allotment provision of the General Allotment Act is insufficient to convince us that the Secretary lacked authority under section 7 of the Taylor Grazing Act to withdraw public domain lands from settlement under the General Allotment Act,

**22.** House Hearings on H.R. 2835 & H.R. 6462, 73d Cong., 3d Sess. 23, 189 (1934); Sen. Hearings on H.R. 6462, 73d Cong., 2d Sess. 27, 36, 87, 90–92 (1934); Sen. Hearings on 2539, 74th Cong., 1st Sess. 51 (1935); 78 Cong.Rec. 6347, 6357, 11140, 11146, 11161 (1934).

**23.** House Hearings on H.R. 2835 & H.R. 6462, *supra*, at 22–23, 33, 92, 101, 103, 109, 138; Sen. Hearings on H.R. 6462, *supra*, at 36, 65–66, 86, 93; 78 Cong.Rec. 6347, 6355, 6357. *See also* S.Rep. 2371, 74th Cong., 2d Sess., June 15, 1936; H.Rep. 903, 73d Cong., 2d Sess., Mar. 10, 1934, p. 3.

**24.** Senate Hearings on H.R. 6462, *supra*, at 86, 171; 78 Cong.Rec. 6355, 11141.

*See* Gates, History of Public Land Law Development 521–22 (1965).

**25.** H.Rep. 903, 73d Cong., 2d Sess., Mar. 10, 1934, p. 2; Senate Hearings on H.R. 6462, *supra*, at 86; 78 Cong.Rec. 6347–48, 6356–58, 6364, 11139. *See* Note, The Public Land Laws: Need for Revision, 39 N.Y.U.L.Rev. 473–74, 480–81, 486–87 (1964).

**26.** The draftsman of the language testified that it was intended to be read literally, and therefore "would include any other use." Senate Hearings on S. 2539, *supra*, at 9. *See also* Carl v. Udall, 114 U.S.App.D.C. 33, 309 F.2d 653, 657 (1962).

and to condition entry and settlement upon a prior classification of lands as suitable for allotment under the latter Act.

■ We therefore conclude that the twenty-six applications in the second group were properly rejected.[27]

■ As we have said, the district court held that the Land Office orders rejecting the first group of seven applications could not be reviewed because the applicants failed to appeal these orders to the Bureau of Lands Management. "[A]pplication of the rule of exhaustion of administrative remedies requires the exercise of judicial discretion" based upon an evaluation of the facts of the given case in light of the purposes of the rule. Craycroft v. Ferrall, 408 F.2d 587 (9th Cir. 1969). The district court does not appear to have made such an evaluation here. We therefore consider the merits.

■ 43 U.S.C. § 1171 authorizes the Secretary to order into the market and sell at public auction any isolated or disconnected tract of public domain not exceeding 1,520 acres. Exercising his "broad authority to issue regulations" concerning public lands (Best v. Humboldt Placer Mining Co., 371 U.S. 334, 336, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963)),[28] the Secretary provided that "the publication of a notice * * * placing lands into market will segregate such lands from all appropriations, including locations under the mining laws, and from other petitions and applications, effective on the date of the first publication of the notice." 43 C.F.R. § 2243.1–6 (1968). The seven applications involved here were rejected because they were filed after publication of a notice placing the claimed lands in the market.

The regulation is reasonably related to the orderly discharge of the Secretary's authority under 43 U.S.C. § 1171, and is not inconsistent with the purpose of either that statute or the General Allotment Act. It therefore bound the Secretary (Chapman v. Sheridan-Wyoming Coal Co., 338 U.S. 621, 629, 70 S.Ct. 392, 94 L.Ed. 393 (1954)), and required him to reject applications incompatible with its terms.

Affirmed.

---

**27.** Plaintiffs' contention that as construed the General Allotment Act is unconstitutional is frivolous. The argument is that other homestead acts, applicable to non-Indians, do not require that the lands sought be sufficient to support the applicant. The premise appears to be wrong. See 43 C.F.R. § 2410.1–3(d) (4) (iii). Furthermore, Indians are entitled equally with other citizens to make entry under the general homestead laws. United States v. Jackson, 280 U.S. 183, 197, 50 S.Ct. 143, 74 L.Ed. 361 (1930) ; Instructions, Indian Homesteads—Patents, 47 Interior Dec. 613, 616–19 (1921).

**28.** See 43 U.S.C. § 1201.